**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
          jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10069
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TREVOR CHARLES, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>   v.<br><br><br>SNAP, INC.,<br><br>                    Defendant. | Case No.  2:26-cv-4928<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

# TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ........................................................................................ 1

THE PARTIES ......................................................................................................... 1

JURISDICTION AND VENUE ................................................................................. 2

FACTUAL ALLEGATIONS ..................................................................................... 3

I.      SNAPCHAT ................................................................................................. 3

II.     SNAP'S ONLINE TRACKING TECHNOLOGY ........................................... 6

        A.      Persistent Identifiers........................................................................ 7

                1.      IP Addresses ........................................................................ 9

                2.      ID Bridging ......................................................................... 13

                3.      Email Addresses, Phone Numbers, and Other
                        Addressing Information ....................................................... 16

        B.      Interception of Communications...................................................... 17

                1.      Universal Resource Locator ................................................ 17

                2.      Button Clicks ...................................................................... 18

III.    SNAP'S ADVERTISING PRODUCTS ......................................................... 19

        A.      Snapchat Ads for Business............................................................... 19

        B.      Identity Resolution.......................................................................... 22

IV.     SNAP DISCLOSES CONSUMER INFORMATION TO AND
        RECEIVES INFORMATION FROM DATA BROKER EXPERIAN .......... 23

V.      DEFENDANT'S TRACKERS ARE PRESENT ON EACH OF THE
        SUBJECT WEBSITES AND ACROSS THE INTERNET........................... 29

        A.      Zillow .............................................................................................. 29

        B.      Western Union ................................................................................. 31

VI.     PLAINTIFF'S EXPERIENCE ...................................................................... 34

CLASS ALLEGATIONS ......................................................................................... 35

CAUSES OF ACTION ................................................................................................ 37

    COUNT I ........................................................................................................ 37

    COUNT II ....................................................................................................... 39

PRAYER FOR RELIEF ............................................................................................. 42

JURY TRIAL DEMANDED ....................................................................................... 43

Plaintiff Trevor Charles ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Snap, Inc. ("Snap" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegation specifically pertaining to himself, which are based on personal belief.

## NATURE OF THE ACTION

1. This class action lawsuit sets forth how Snap surveils of millions of Americans, including millions of people who do not have Snapchat accounts, through their activity on the Internet and mobile applications. Snap, through its software products, tracks in real time and records indefinitely non-anonymous personal information and specific web activity of hundreds of millions of Americans.

2. Snap collects this information to identify users of the Snap social media platform and serve them with advertisements based on their activity off the platform and, in doing so, connects intimate details about their person and behavior to an individual's email address and phone number. This, on its own, is invasive enough, but Snap also collects and stores the information of millions of people who do not have Snap accounts.

3. This unlawfully collected information is worth billions of dollars to Defendant because it fuels the advertising machine on Snap, at the expense of Americans' privacy.

4. Plaintiff brings this action to enforce their constitutional rights to privacy and to seek damages under Federal and state law for the harm caused by the collection and sale of their confidential data and personal information.

## THE PARTIES

5. Plaintiff Trevor Charles is a natural person and citizen of Connecticut, residing in Middletown, Connecticut. Plaintiff Charles visited numerous websites where Snap's tracking technology was present and had his activity on those websites

and subsequent activity on other websites tracked by Defendant. Plaintiff Charles does not have a Snapchat account.

6. Defendant Snap, Inc. is a Delaware corporation with its principal place of business at 2772 Donald Douglas Loop N, Santa Monica, California 90405. Snap, Inc. owns and operates the Snap Pixel and the Snapchat social media platform, including its advertising service.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

8. This has personal jurisdiction over Defendant because Defendant collected the private information of thousands or millions of people in California, sold that information to advertisers in California—who targeted advertisements to Californians based in part on their location in California—and profited from the sale of Californians' personal information. Further, Defendant's principal place of business is in California.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District and Defendant resides in this District.

## FACTUAL ALLEGATIONS

### I.    SNAPCHAT

10.    Defendant Snap, Inc. is the developer of Snapchat, a social media and instant messaging application that was founded in 2011 by Evan Speigel, Bobby Murphy, and Reggie Brown.[1]

11.    Currently, Snapchat is one of the largest social media platforms in the world, with over 946 million monthly active users worldwide, 474 million daily active users worldwide and over 94 million daily active users in North America.[2] It is available through a desktop browser, but also as a mobile application ("the App").

12.    Snapchat is "visual messaging service that enhances your communication with friends, family and the world."[3]  Multimedia messages aptly named "snaps" can be shared with and sent directly to individual "friends" (accounts the users are connected to), or shared to the users "Story," a feature that displays the multimedia image for only 24 hours on the users account. Users can also send money to each other via private messaging using Snap's "Snapcash" feature.

13.    The central feature of the Snapchat platform is its Snapchat Discover page. This page is a recommendation system is a complex series of algorithms that powers the page. The Discover page is "a section of the Snapchat app that features content from big brands and publishers. It's kind of like its own feed, but instead of seeing a mix of single posts from various creators, you see "collections" in story

---

[1] *Snapchat Reaches Settlement with its Disappearing Co-Founder*, BLOOMBERG, https://www.bloomberg.com/news/articles/2014-09-09/snapchat-settles-reggie-brown-suit-credits-him-with-original-idea

[2] *Snap Inc*, SNAP INC. ANNOUNCES FOURTH QUARTER AND FULL YEAR 2025 FINANCIAL RESULTS
https://investor.snap.com/news/news-details/2026/Snap-Inc--Announces-Fourth-Quarter-and-Full-Year-2025-Financial-Results/default.aspx

[3] *Snap Inc*,
https://www.snap.com/?utm_source=developers_snap_com&utm_medium=referral&utm_campa ign=universal_navigation&utm_content=footer_item_link (last accessed Jan. 19, 2026).

---

format."[4] Along with featured content from top creators, there is catered ad integrated into the feed.

14. Snap's algorithm pushes content to users' Discover page in part by analyzing "viewing history, as well as content you have watched more recently, including content we think you like based on the duration you watched it, as well as whether you tapped "favorite" or shared the content, or content we don't think you like because you have chosen to hide or report the content, a user's age, gender, country of residence and language."[5] After collecting these data points, Snap can steer users towards more videos that are meant to keep users scrolling.

15. Users' interactions with their Discover Page (the pre-curated content selected by Snap) are monitored in part to strengthen Snap's algorithms and continue serving relevant and engaging content. But Snap also, upon information and belief, monitors users' behavior to better monetize their users' data.

16. Like nearly all social media platforms, access to Snapchat is free. This is because it makes its money elsewhere: through advertising and monetization. In the final three months of 2025, Snap made approximately $1.71 billion, with approximately $1.48 billion coming from advertising.[6] That is approximately 86.5% of its fourth quarter revenue.

17. Snap's aggressive push for advertising and monetization in the United States has paid off. In Snap's Quarter Three (Oct 2025 to December 2025) financial reports, Snap reported that its revenue from North America TTM (Trailing over Twelve Months) was $3.5 billion, which is approximately 61% of its total revenue

---

[4] https://www.meltwater.com/en/blog/snapchat-discover

[5] *https://help.snapchat.com/hc/en-us/articles/8961631424020-How-We-Rank-Content-on-Discover*

[6] *https://investor.snap.com/news/news-details/2026/Snap-Inc--Announces-Fourth-Quarter-and-Full-Year-2025-Financial-Results/default.aspx*

TTM of $5.7 billion.[7]  North America accounts for just 19% of Snapchat's daily active users but generates 61% of the platform's ad revenue worldwide.[8]

18.   Snap admits that it monitors and collects user information to better advertise and monetize users' attention and interests. Snap claims that it "uses cookies, including third-party cookies, for a number of reasons, like…helping us see which features are most popular, counting visitors to a page, understanding how you engage with web content and emails we send, improving our users' experience, keeping our services secure, providing relevant advertising, and just generally providing you with a better, more intuitive, and satisfying experience."[9]

19.   Snap uses marketing cookies to "deliver advertisements, to make them more relevant and meaningful to consumers, and to track the efficiency of our advertising campaigns, both on our services and on other websites or mobile."[10]

20.   The impact of Snap's surveillance of user behavior is evident all over its platform. Firstly, each user's individual Discover Page—which contains organic multimedia content—also contains numerous personalized advertisements for products. The ads are seamlessly integrated with other video content, meaning that users are served ads as part of their "endless scroll."

21.   This hyper targeted ad delivery is accomplished through Snap's suite of products and the collection of mass amounts of information about users on and off of Snapchat.

---

[7] *Id.*

[8] *Id.*

[9] https://www.snap.com/cookie-policy

[10] https://www.snap.com/cookie-policy

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    5

## II.    SNAP'S ONLINE TRACKING TECHNOLOGY

22.    The Snap Pixel is "a piece of JavaScript code that helps Advertisers measure the cross-device impact of Campaigns. ."[11]

23.    In other words, the Snap pixel is a piece of code that Snapchat Ads for Business clients implement on their websites to track their users' website behavior. The Snap Pixel then transmits that user behavior data back to Snap in order to better target users for advertising.

24.    The Snap Pixel Tracks a wide variety of user activity across the internet. One report estimates that the Snap Pixel tracked .33% of all web activity, billions of interactions with websites from July 2018 to Jan 2026.[12]

25.    If configured for "Automated Matching," the Snap Pixel "will automatically attempt to detect and send Snap information about your customers such as information from forms on your website." "These user signals can help boost match rates, which in turn increases the number of attributed conversions [Snap]can tie back to [Advertising] campaigns."

26.    Snap's Conversions API (CAPI) also allows website operators "to directly pass web, app, and offline events to Snap via a Server-to-Server (S2S) integration." [13]

27.    CAPI, in other words, further allows Snapchat Ads for Business clients to integrate and share their data with Snap to boost their advertising capabilities in order to "optimize [] ad campaigns, improve [] targeting and measure the

---

[11] https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US.

[12] https://www.ghostery.com/whotracksme/trackers/snapchat

[13] https://businesshelp.snapchat.com/s/article/conversions-api?language=en_US#:~:text=API%20(CAPI)?-,What%20is%20Conversions%20API%20(CAPI)?,about%20our%20partner%20integrations%20here.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                          6

conversions action that resulted from [] Snapchat campaigns." These events "behave similarly to events sent via other solutions, like Snap Pixel."[14]

28.    For Snapchat Ads for Business clients, the benefits of utilizing Snap's CAPI include a "robust targeting" whereby "[c]onversions API will allow you to populate first-party custom audiences in real-time, which you can use to create Lookalikes from, or re-engage with your existing customers and an "improved measurement" because CAPI allows Snapchat Ads for Business clients a "[b]etter understand the results that your campaigns are driving across all channels through a single solution;

29.    The Snap Pixel and Snap's CAPI are marketing/advertising solutions that allow Snap to identify, survey, and categorize users by combining Snapchat Ads for Business clients' data with Snap's own data. In this way, Snap augments its own data set, and adds to or creates profiles of users for the sake of advertising.

30.    All of this is accomplished through the collection of persistent identifiers and interception of communications by the Snap Pixel.

### A.    Persistent Identifiers

31.    One way that Snap tracks individuals across multiple websites is through the use of persistent identifiers.  As the name suggests, persistent identifiers are identifying information that follows an Internet user from one website or app to another. Snap uses these identifiers to confirm that a visitor using a particular website is the same person identified by Snap on its App.

32.    One form of persistent identifier is a browser "cookie."  "Cookies are bits of data that are sent to and from your browser to identify you.  When you open a website, your browser sends a piece of data to the web server hosting that website."[15]

---

[14] Id.

[15] https://www.microsoft.com/en-us/edge/learning-center/what-are-cookies?form=MA13I2 (last visited Dec. 23, 2024).

33.     Snap uses several cookies, including but not limited to "_sc-sid," "Marketing," "Performance" and "Preference."[16]  Snap, as mentioned above, says that these cookies can "like protecting your Snapchat data and account, helping us see which features are most popular, counting visitors to a page, understanding how you engage with web content and emails we send, improving our users' experience, keeping our services secure, providing relevant advertising."[17]

34.     Specifically, Snap highlights that other companies " may collect information about how you use our services over time and combine it with similar information from other services and companies. This information may be used to, among other things, analyze and track data, determine the popularity of certain content, and better understand your online activity."[18]

35.     When a user visits a website that utilizes Snap's Pixel, the Advertising Partner requests that Snap set a cookie onto the browser or device of the person visiting the website. Snap then links these proprietary ID numbers to the cookie and the individual with the cookie.

36.     After the cookie is loaded onto a person's browser, each time that person visits a website where the Snap Pixel is operating, Snap uses the cookie to identify the website visitor as the same person who visited previous websites with the same cookie installed on their browser, and thereafter matches it to a user of the Snapchat App.  As such, Snap is able to track each individual App user across multiple sites to create a more detailed profile on that person's beliefs, interests, and habits.

37.     This information is cross-referenced with other information collected by Snap to specifically identify the individual using the device and to add this web-

[16] https://www.snap.com/privacy/cookie-information#Necessary

[17] *Id*.

[18] *Id.*

activity information to a larger profile on the individual to sell their profile for targeted advertising.

### 1.   IP Addresses

38.    Snap says that it collects information from users, including their IP addresses.

39.    IP addresses are another common persistent identifier.

40.    An IP address is a unique set of numbers assigned to a device on a network, which is typically expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses.  Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[19]

41.    Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

42.    IP addresses are not freely accessible.  If an individual is not actively sending data packets out, their IP address remains private and is not broadcast to the wider internet.

43.    IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude, and longitude coordinates, or even the internet service provider

---

[19] *See, e.g.*, https://www.cloudflare.com/learning/network-layer/internet-protocol/ (last visited Dec. 23, 2024); https://netbeez.net/blog/rfc1918/ (last visited Dec. 23, 2024).

associated with the public IP.[20]  Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[21]

44.    An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[22] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[23]  Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[24] because "[c]ompanies can use an IP address … to personally identify individuals."[25]

45.    In fact, an IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their

---

[20] https://iplocation.io/ (last visited Dec. 23, 2024).

[21] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[22] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[23] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert williams-z7bhf.

[24] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[25] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

needs."[26]  For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[27]

46.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[28]

47.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[29]

48.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising."[30]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[31]

---

[26] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[27] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[28] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[29] *Id*.

[30] Williams, https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[31] *Id*.

49.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[32]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[33]

50.    Putting IP addresses in the hands of a companies like Snap is particularly invasive, as the NATO report noted:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network.  Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behavior across devices and target the user and their devices with ads on different networks.[34]

51.    Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[35]

52.    In other words, not only does the collection of IP addresses by Defendant cause harm in and of itself, the Defendant specifically attaches IP addresses to comprehensive user profiles, tracking Plaintiff and Class Members

---

[32] *Id.*

[33] *Id.*

[34] TWETMAN & BERGMANIS-KORATS, *supra* at 11.

[35] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

across the Internet using their IP addresses in conjunction with other data and compiling vast reams of other personal information in the process.

53.　For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[36]

### 2.　ID Bridging

54.　Snap is clear that the purpose of its Snap Pixel is to combine the identifiers intercepted by the Pixel with other identifiers to identify users in what is known as ID Bridging. "ID Bridging" is the process of "piecing together different bits of information about" a user "to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers."[37]  That is, users can be identified and tracked by "bridging" (or linking) their IDs to other sources, such as e-mail addresses, geolocation, or phone numbers.

55.　ID Bridging "has long been the foundation of programmatic advertising,"[38] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[39]  It entails a "unique identifier[] assigned to individual devices," including "Google's Advertising ID,"

---

[36] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[37] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024, https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.

[38] https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[39] PROGRAMMATIC ADVERTISING, https://advertising.amazon.com/blog/programmatic-advertising#.

---

personal information like geolocation and e-mail address, and "cross-platform linkage."[40]

56.    ID Bridging is a money-making machine for advertisers and app developers.  On the advertiser side, ID Bridging "increase the chances of an ad buying platform finding their inventory to be addressable and, therefore, maximizes their 'ad yields.'"  And on the app developer side, "publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[41]

57.    In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information.  And app users' information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

58.    Many companies (*e.g.*, social media companies, data brokers, identity graph providers), publicly advertise their ability to conduct such bridging.

59.    Put simply, ID bridging enables an advertiser to extend user identification "beyond  beyond what happens during a single session, or on a single device."[42]

---

[40] Anete Jodzevica, *ID Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD (Nov. 15, 2024), https://setupad.com/blog/id-bridging/.  Ironically, the example given in this article is a "hashed e-mail," where the e-mail Defendant collected in this example is not hashed.

[41] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It To Grow Direct And Programmatic Revenue?*, OPTABLE (Aug. 22, 2024. https://www.optable.co/blog/what-is-id-bridging.

[42] https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US; *See also, e.g.*, Budi Tanzi, *New OpenRTB Specs Ensure Identity Resolution Can Be Done Transparently With Trusted Partners*, EXPERIAN (Dec. 18, 2024), https://www.experian.com/blogs/marketing-forward/new-openrtb-specs-ensure-identity-resolution-can-be-done-transparently-with-trusted-partners/.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                           14

60.    Yet, while those within the ID Bridging industry describe it as privacy-protective, it is anything but.  As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them." *Katz-Lacabe v. Oracle Am., Inc.*, 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

61.    In February 2019, Oracle published a paper entitled "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides as accurate a description of Google's services (and Snap's, as Defendant):

> a consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities. This information is collected through an extensive web of … services, which is difficult, if not impossible to avoid.  It is largely collected invisibly and without consumer consent.   Processed by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socio-economics, demographics, "likes", activities and more.  It may or may not be associated with a specific users' name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[43]

62.    In other words, ID Bridging is dangerous because of the sheer expanse of information being compiled by companies like Defendant Snap without the knowledge or consent of users, all of which is being done for pecuniary gain.

---

[43] GOOGLE'S SHADOW PROFILE: A DOSSIER OF CONSUMERS ONLINE AND REAL WORLD LIFE at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

### 3. Email Addresses, Phone Numbers, and Other Addressing Information

63. Perhaps even more invasive than any other identifier, the Snap Pixel's mass collection of email addresses from websites represents a grave privacy violation. Snap "strongly suggest[s]" website operators to pass email addresses and phone numbers "through the Snap Pixel."[44]

64. The logic of this is straightforward. If Snap collects the same e-mail address or phone number from two different site visits, it can determine with almost total accuracy that the sites are both being visited by the same person. The same is true of devices. If the same e-mail address is captured on two different devices, it is very likely those devices are used by the same individual.

65. Although Defendant collects hashed SHA256[45] e-mail addresses, the reality is that "the match between your email and its hash is probably already circulating widely and companies are marking money from it."[46] Given the availability online of such "leaked" email/hashed email matches, entities are merely "pretend[ing]to protect your privacy"[47] through SHA-256 and/or other hashing algorithms.

66. The Federal Trade Commission has warned companies for over a decade—including as recently as July 24, 2024—that hashing is an insufficient method of anonymizing information.[48]

---

[44] https://businesshelp.snapchat.com/s/article/pixel-faqs?language=en_US.

[45] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash; *see also Automated Advanced Matching*, SNAP (last accessed Feb. 2026), https://business.Snaphelp.com/s/article/automated-advanced-matching

[46] PIXEL DE TRACKING, GUERLAIN (LVMH): LUXURY AND SURVEILLANCE, https://www-pixeldetracking-com.translate.goog/fr/votre-email-comme-vecteur-de-surveillance-ultime-illustration-avec-guerlain?_x_tr_sl=fr&_x_tr_tl=en&_x_tr_hl=en&_x_tr_pto=sc.

[47] *Id.*

[48] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as

67. Thus, even in hashed form, email addresses are traceable to individuals.

68. Location information functions in a similar manner. If multiple websites are visited from the same location, the pool of potential individuals who are accessing the website or app is narrowed considerably immediately and can be narrowed to a pinpoint over time.

69. HTTP requests, when intercepted by Snap, collect device information that can also identify whether the same user is visiting multiple sites, and can distinguish between the devices being used by a particular person. With every visit, and every subsequent HTTP request, the device information will be identical in each.

**B. Interception of Communications**

*1. Universal Resource Locator*

70. The Snap Pixel also intercepts millions of communications with websites through the interception of full-string URLs.

71. Snap, through and with its Advertising Partners' tags and tag manager solutions—including via the Snap Pixel— is collecting the Universal Resource Locator (URL) of the webpages visited by users of websites where the Snap Pixel is installed.

72. Sometimes known as a "web address," the URL is the name of the webpage as displayed in the address bar of a browser.

73. Each page on a website has its own individual URL, allowing tags with access to the URL to see which pages of a website a particular internet user visited.

74. All URLs identify the pages of each page of a website an internet user visited.

---

an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data *is risky at best, and usually wrong.*") (emphasis added); *No, Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024) ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized.").

75.    For example, when viewing an article on the Zillow website, the full name of the Article is included in the URL:



76.    As such, any tag that intercepts the URL on this page also intercepts the titles of the content the users view.  This process works similarly on other websites.

77.    Snap, through its Advertising Partners' tags and tag manager solutions, and via the Snap Pixel, collects the URLs and any information that can be gleaned or inferred from those URLs are added to the profiles that Snap has for that particular Website or App user.

   *2.    Button Clicks*

78.    The Snap pixel can also be configured to intercept the specific buttons a user clicks on a website or app.

79.    For example, when completing a transaction on the Western Union website, the user is prompted to select their country of birth. When the selection is made, the Snap Pixel intercepts the selection.



80.     As such, each "button click" event allows Snap to intercept specific communications between the individual and a website or app.

## III.   SNAP'S ADVERTISING PRODUCTS

81.     Snap does not collect such a wide breadth of information for no reason, it uses the information it collects to target advertising on and off Snapchat.

### A.     Snapchat Ads for Business

82.     Snapchat  Ads for Business is Snap's business suite of tools. It offers marketing solutions to advertisers, sellers and creators who wish to advertise, sell, or create content on Snapchat.

83.     Part of the Snapchat Ads for Business platform is Snap Ads Manager, which provides clients the ability to "see reach and impressions, engagement, cost per result, conversion data."[49]

---

[49] https://forbusiness.snapchat.com/advertising/start-snapchat-ads?_sid=PAID&utm_source=GoogleSEM&utm_medium=PAIDB2B&utm_campaign=US_G_Search_Brand_MKAG-snapchatads&utm_term=US&utm_content=startsnapchatads&gad_source=1&gad_campaignid=17476413091&gbraid=0AAAAADJr79gaeBBacYpdXw9DKnramuXDn

84. Snap Ads Manager also comes with measurement and analytics capabilities, which it calls "Audience Insights."

85. "Audience Insights" provide "[s]napchat data — like demographics and interest categories — as well as external data from select third party data partner" in order to "help [clients] learn more about [their] target audience on Snapchat so [they] can create relevant content and surface additional targetable segments to grow reach." [50]

86. By using Audience Insights, an advertiser or seller can access data that includes: "[1] [d]emographics overview: [] age and gender breakdowns, languages, household income, education levels, and more; [2] **[l]ocations overview**: []region and DMA breakdown; [3] **[i]nterests overview**: [] interests, both 1st and 3rd party; and [4] [d]**evices overview**: [] OS, device, and carrier breakdowns."[51]

87. Snap also offers the "Custom Audiences" functionality, a " Profile Engagement Audience list based on a specific Public Profile, allowing you to target Snapchatters who have engaged with a Creator's content."

88. This allows Snapchat Ads for Business client the ability to "reach a highly-qualified segment of Snapchatters who have already shown intent and interest in a specific type of content or community."[52]

---

&gclid=CjwKCAiAwNDMBhBfEiwAd7ti1II_iUfkM0hrOh2RNj3T5B9N2mrfoQM qjMa2UDq3AtCzXWpy099YrRoCoSkQAvD_BwE

[50] https://businesshelp.snapchat.com/s/article/audience-insights?language=en_US#:~:text=Audience%20Insights%20help%20you%20learn, %2C%20device%2C%20and%20carrier%20breakdowns.

[51] https://businesshelp.snapchat.com/s/article/audience-insights?language=en_US#:~:text=Audience%20Insights%20help%20you%20learn, %2C%20device%2C%20and%20carrier%20breakdowns.

[52] https://businesshelp.snapchat.com/s/article/creator-audience-targeting?language=en_US

89.     This means Snap's ad targeting allows advertisers to reach audiences based on interests and behaviors, as well as users' gender, device information, and location.

90.     Snap's ad targeting is a form of audience segmentation, otherwise understood as "the process of grouping people based on shared characteristics. These groups, or audience segments, can be used to create more targeted campaigns, and tailored messaging that resonate with your target audiences."[53]

91.     By breaking its audience down into categories by numerous metrics, Snap is able to better monetize its user base and target personalized advertising to them for profit.

92.     Snap's audience segmentation capabilities are made possible by the information it collects from websites.

93.     In this way, Snap has a symbiotic relationship with publishers and advertisers who use its Snap Ads tools to collect behavior and profile data at the more granular level.

94.     Snap collects and compiles vast amounts of Internet users' activity on a wide variety of websites through its own tracking methods, and also through its integrations with third parties that use its ad technology.

95.     Upon information and belief, Snap enhances and combines the data it collects itself and from third parties – i.e. "maps" the data – through its own protocols, allowing it to create detailed profiles for its millions of users.

96.     Snap can pair this information to any it has otherwise collected about the user and has compiled into a profile of the user that Snap maintains, as alleged below.

---

[53] *Audience segmentation: How to perfect it for your marketing,* GWI (last accessed Jan. 2026), https://www.gwi.com/blog/audience-segmentation

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    21

### B.    Identity Resolution

97.    In addition to its own tracking of Website and App users across the internet, Snap engages in a process known as identity resolution – what it calls Advanced Matching. Advanced Matching can be an automatic process, or manually enabled by Snap Ads users.

98.    Identity resolution is the technology marketing term for the process of data tracking described above. As Snap describes it:

99.    Auto-advanced matching uses customer-provided information to associate them with their conversion activity for better ad metrics [... and Manual Advanced Matching allows users to] gain more accurate conversion tracking by passing one or more hashed or unhashed advanced matching signals with every conversion event.[54]

100.    In plain language, identity resolution is the culmination of Snap's and its Advertising Partners' tracking, where Snap matches an App or Website user to a larger record of their web and app activity for the purpose of targeted advertising.

101.    Once sufficient data has been collected on an individual, Snap monetizes the individual's data in a number of ways.  One way is to provide individuals' identities and web browsing information to its Advertising Partners to assist with those companies' serving targeted ads to internet users.

102.    When an Advertising Partner implements Snap's Pixel, the Conversions API, or Snap cookies or technology on its website, Snap compiles the information of users interacting with an Advertising Partner's technology or trackers on that website. It then synthesizes that data with its data on its App users.

---

[54] *Automated Advanced Matching*, SNAP, https://business.Snaphelp.com/s/article/automated-advanced-matching (last accessed Feb. 2026); *see also Manual Advanced Matching for Developers,* SNAP, https://business.Snaphelp.com/s/article/advanced-matching-for-developers (last accessed Feb. 2026)

103.   With respect to the delivery of targeted advertisements on websites and its own Website and App, Snap's ID syncing makes the entire real-time-bidding process possible by identifying the individual visiting the site and providing information about their activity and interests.  This creates the basis for hyper-targeted advertising related to that activity and those interests to be served. This ultimately benefits the website or app operator, as it makes their userbase more valuable because said users have been further identified and linked to other activity via the tags and tag manager solutions.

104.   For these processes to happen, Snap must necessarily share the information it collects on individual internet users with its partners.

105.   The identity resolution service aids in the wiretapping and surveillance conducted by the Advertising Partners.

## IV.   SNAP DISCLOSES CONSUMER INFORMATION TO AND RECEIVES INFORMATION FROM DATA BROKER EXPERIAN

106.   In addition to intercepting information from websites and mobile applications for use in its own advertising services, Snapchat further violates users' privacy by sharing information with Data Broker Experian through Experian's Tapad Pixel.

107.   The Tapad Pixel and Experian's various data products are part of a complex network of data sharing that occurs during the real-time bidding process for the service of advertisements.

108.   The sharing of the information with a data broker for use in the real-time bidding advertising process constitutes a separate, and likely more egregious, violation of user privacy.

109.   "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[55]  Such databases

---

[55] *Id.*

are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."  And whereas individual data sources "may provide only a few elements about a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[56]

110.  For instance, as a report by NATO found, data brokers, like Defendant, collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited.[57]  Inferred data "is gleaned from observed data by modelling or profiling," meaning what consumers may be *expected* to do.[58]  On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[59]

111.  As a report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving consumers of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[60]

---

[56] Tehila Minkus et al., *The City Privacy Attack: Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM CONFERENCE ON ONLINE SOCIAL NETWORKS, at 71, (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[57] Henrik Twetman & Gundars Bergmanis-Korats, *Data Brokers and Security*, at 11, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[58] *Id*.

[59] *Id*.

[60] Twetman & Bergmanis-Korats, *supra* note 9, at 8.

---

112.   This wide swath of personal information, which is compiled into detailed profiles on each individual, is then sold or otherwise monetized through real-time bidding.

113.   "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[61]

114.   Facilitating this process means the entities involved in the bidding (called SSPs, DSPs, and DMPs)  must have as much information as possible about consumers to procure the greatest interest from advertisers and obtain the highest bids for websites and app operators' users.  But these SSPs and DSPs receive assistance by connecting with data brokers like Experian.

115.   Before bidding to show a user an advertisement, SSPs and DSPs will attempt to determine what other information about a user may be available, which they achieve by connecting with other data brokers and identity graph providers, who then matches a consumer's information from a particular website or mobile application (*e.g.*, their IP address, email address, or device information) with any profiles it has compiled.

116.   If there is a match, then advertisers will pay more money to show users an advertisement because they have more information to help achieve their targeted marketing aims.  This naturally enriches website and app operators, because their users are more valuable within this scheme.  It also enriches SSPs who can offer users to advertisers for more money based on the greater number of traits available, and DSPs who can receive higher bids for the same users.  And SSPs and DSPs can continue linking users on a website or mobile application through the Advertising Exchange, which enhances the SSP's and DSP's ability to better identify users in the future and helps the SSP and DSP profit further as well.

---

[61] Sara Geoghegan, *What is Real Time Bidding?,* ELECTRONIC PRIVACY INFORMATION CENTER, (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

117. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including "sending consumer data "***to potentially dozens of bidders simultaneously***, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[62]

118. This means that the profiles that Defendant compiles are broadcast to *all* prospective advertisers, even if advertisers do not ultimately show a user an advertisement. Further, it leaves users more exposed if bad actors infiltrate and exploit the RTB ecosystem and obtain the sensitive data that Defendant provides to DSPs. This greatly diminishes the ability of users to control their personal information, and it serves as a national security risk because foreign adversaries can obtain and exploit the information to their advantage.

119. For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information.[63]

120. As such, Defendant's sharing of users' information with the Tapad Pixel exposes each user to a wide dissemination of their personal data.

121. Snap shares information with Experian on a wide variety of websites through a process called cookie syncing.

122. Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user

---

[62] Office of Technology & Division of Privacy and Identity Protection, *Unpacking Real Time Bidding through FTC's case on Mobilewalla*, FEDERAL TRADE COMMISSION, (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.
[63] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

while they browse the web."[64]  This allows entities like Defendant and Experian to circumvent "the restriction that sites can't read each other['s] cookies, in order to better facilitate targeting and real-time bidding."[65]

123.   Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[66]

124.   Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[67]

125.   As an example, the Snap Pixel and the Tapad Pixel are both present on the Western Union website and match the user with their own proprietary cookie values. Then, a "sync" event is initiated.  Each pixel sends a request to the other and receives the other's ID, thus sharing information collected by each pixel with the other entity.

```
302   GET   pixel.tapad.com
/idsync/ex/push?partner_id=2884&partner_url=https%253A%252F%252Ftr.snapchat.com%25
2Fcm%252Fp%253Frand%253D1748358665145%2526pnid%253D140%2526pcid%253D%2524
%257BTA_DEVICE_ID%257D
Tue May 27 11:49:29 EDT 2025

Cookies:
TapAd_TS    1741901642196
TapAd_DID    dd51e910-292a-4f79-afcc-fcfcb230da91
TapAd_3WAY_SYNCS    1!3453-2!3450-3!3450
```

```
200   GET   tr.snapchat.com
/cm/p?rand=1748358665145&pnid=140&pcid=dd51e910-292a-4f79-afcc-fcfcb230da91   Tue
May 27 11:49:29 EDT 2025

Cookies:
sc_at
v2|H4sIAAAAAAAAAE3GyQ3AMAgEwIqQlnAYpxuIoAoX72/mNd3BsA7S+YSURyItGTIgOfJUZR1Wv
Lw0xLF9n19xAULIoKFAAAAA

Data:
rand    1748358665145
pnid    140
pcid    dd51e910-292a-4f79-afcc-fcfcb230da91
```

[64] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[65] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

[66] *Id.*

[67] *Id.* at 1441.

126.   In this way, Snap (1) Improperly benefits from Experian's mass surveillance of individuals on the internet (2) contributes to that surveillance by giving or selling the information it collects on users to Experian and (3) exposes internet users' data to wide dissemination through the real-time bidding advertising process by supplying that information to Experian, who through its Tapad Pixel, participates in real time bidding and cookie syncing with dozens of data brokers and identity graph providers.

*        *        *

127.   To summarize the proceeding allegations, Defendant deploys the Snap Pixel on hundreds or thousands of websites to collect as much information about users as possible to create comprehensive user profiles.  These profiles are shared by Defendant with other entities (and vice versa) to compile as many details and attributes as possible.  The profiles are offered up for sale to advertisers via Snap Ads, where they become increasingly more valuable as advertisers know more about the user.  Further, through cookie syncing and likely other means, Snap sells user data to Experian, which results in the wide dissemination of that data through the real-time bidding process. Snap also receives information from profiles compiled by Experian, which is also the result of widespread internet tracking. Thus, Defendant increases the price premium that advertisers are willing to pay because Defendant's ability to match users up to comprehensive profiles allows users to be identified and more directly targeted based on an assortment of identifiers and interests.

128.   Accordingly, Defendant is using its Trackers in conjunction with website and mobile application operators and to (i) de-anonymize users, (ii) offer users up for sale in real-time bidding and its own advertising network, and (iii) allow website operators to maximum revenue by installing Defendant's Trackers and

allowing the Defendant to collect as much information about users as possible without consent.[68]

129.  Of course, Defendant also benefits from this arrangement because websites will want to employ Defendant's services to bring in more advertising revenue, meaning Defendant can continue to expand and grow the information they have about any consumers and add to consumers' profiles, which further perpetuates the value of Defendant's services.

## V.  DEFENDANT'S TRACKERS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES AND ACROSS THE INTERNET

131.  As part of their investigation, Plaintiff's counsel found and conducted testing on several websites to provide a sample of the widespread tracking and wiretapping of, and targeted advertising to, millions of Americans by Defendant.  For each of the websites tested, there are hundreds or thousands of others where the same or similar information is collected.

132.  Thus, the conduct alleged in this Complaint is *not* limited to the specific websites alleged below.  Indeed, even Plaintiff visited other websites where Plaintiff's counsel found Snap would have tracked Plaintiff.  Instead, these websites are merely examples of the types of data that Snap collects, and the ways in which it surveils users across the Internet.

### A.  Zillow

133.  Zillow is an online real estate listing website, where website visitors can view properties to rent or buy and interact with landlords and real estate agents.

134.  Unbeknownst to website visitors, the Snap Pixel is loaded onto each page of the Zillow website.

---

[68] Any purported "consent" obtained by third-party websites via cookie banners is invalid because those: (i) those often fail to honor the user's selected preference; (ii) fail to disclose data is being sent to a credit reporting agency for identity resolution; and (iii) Snap is a third party to that interaction, engaging in the recording or decoding of data it has no direct right to access.

135.   The Snap Pixel immediately loads tracking cookies onto the individual's browser in the manner described herein.

**Cookies:**
sc_at
v2|H4sIAAAAAAAAAE3GwRHAIAgEwIqYAb2cYDcRpQqLzzf7WqvTCFK2aQjgIlU80py1HLnfymvQa
aNzhD4e91f9AKaZhyFAAAAA

136.   The Snap Pixel also intercepts the detailed, full-string URL from each page of the Zillow website a user visits, as detailed above, thereby intercepting the user's communications with the website regarding which properties they are interested in.



"url":
"https://www.zillow.com/homedetails/11726-Balboa-Blvd-Granada-Hills-CA-91344/20110219_zpid/",

137.   The Snap Pixel also intercepts a hashed version of the users' email address and phone number as that information is entered into the Zillow website, as described herein.

"u_hems": "2a9a22d88b031064ea86ff104d1cabf6b14a866c2a4adf136def1330b49fecbb",
"u_hpns": "1de2ad1ae2781b3bb9554ddb267969b7831ffb2d6087ff9676c54281e5a5a855"

138.   The Snap Pixel also collects the user's browser and device information in the manner described herein.

"d_bvs": "[{\"brand\":\"Google
Chrome\",\"version\":\"131.0.6778.265\"},{\"brand\":\"Chromium\",\"version\":\"131.0.6778.265\"},{\"br
and\":\"Not_A Brand\",\"version\":\"24.0.0.0\"}]",
"d_ot": "Windows",
"d_os": "15.0.0",
"huah": true,
"cbt": []

139.  The Snap Pixel also engages in cookie syncing and identity resolution with the Tapad Pixel on the Zillow website in the manner described herein.

```
https://pixel.tapad.com/idsync/ex/push?partner_id=2884&partner_url=https://tr.snapchat.com/p?r
and=1736742818470&pnid=140&pcid=${TA_DEVICE_ID}
```

140.  Defendant then uses the information it collects and receives from Tapad to link the user to a de-anonymized profile and adds any new information to that profile. This profile is connected to the ID assigned to the individual, and to the individual's email address and phone number, and added to Defendant's advertising products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and information viewed—and Zillow—as its users are more valuable now that their information is being connected to Defendant's vast repository of information.

141.  In addition, because of the setting of cookies and collecting of the user's device information, and email address, Defendant tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the advertising process.

**B.    Western Union**

142.  Western Union is a website where users can send money both domestically and internationally.

143.  Unbeknownst to website visitors, the Snap Pixel is loaded onto each page of the Western Union website.

144.  The Snap Pixel immediately loads tracking cookies onto the individual's browser in the manner described herein.

```
Cookies:
sc_at
v2|H4sIAAAAAAAAE3GwRHAIAgEwIqYAb2cYDcRpQqLzzf7WqvTCFK2aQjgIlU80py1HLnfymvQa
aNzhD4e91f9AKaZhyFAAAAA
```

145.    The Snap Pixel also collects the user's browser and device information in the manner described herein.

"d_bvs": "[,{\"brand\":\"Chromium\",\"version\":\"136.0.7103.114\"}{\"brand\":\"Google Chrome\",\"version\":\"136.0.7103.114\"}{\"brand\":\"Not.A/Brand\",\"version\":\"99.0.0.0\"}]",
    "d_ot": "Windows",
    "d_os": "19.0.0",

146.    The Snap Pixel also intercepts a hashed version of the user's email address as described herein.

"pc": {
    "av": 5,
    "pids": ["ed02c2ba-cfa7-4827-8cb0-dfdd4b8ca7f0"],
    "u_hems": "1b30b287d48ec5fd0d3fc6dc7ec57f0579ac6362a8862f198beb537f14c51f75"

147.    The Snap Pixel also intercepts full-string detailed URLs from the Western Union website. Notably, intercepting the URL means that Snap is intercepting the amount sent and the currency exchange requested.



"url": "https://www.westernunion.com/us/en/web/user/register?ReceiveCountry=AU&ISOCurrency=AUD&SendAmount=4320&funds-out=DB&funds-in=AC",

148. The Snap Pixel also collects numerous button click events on the Western Union website, as described herein, including a selection for the user's country of birth.



149. The Snap Pixel also engages in identity resolution and cookie syncing with the Tapad Pixel on the Western Union Website, as described herein.

```
302   GET   pixel.tapad.com
/idsync/ex/push?partner_id=2884&partner_url=https%253A%252F%252Ftr.snapchat.com%25
2Fcm%252Fp%253Frand%253D1748358665145%2526pnid%253D140%2526pcid%253D%2524
%257BTA_DEVICE_ID%257D
Tue May 27 11:49:29 EDT 2025
```

150. Defendant then uses the information it collects or receives from Experian to link the user to a de-anonymized profile and adds any new information to that profile. This profile is connected to the ID assigned to the individual, and to the individual's email address and phone number, and added to Defendant's advertising products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and

information viewed—and Western Union—as its users are more valuable now that their information is being connected to Defendant's vast repository of information.

151. In addition, because of the setting of cookies and collecting of the user's device information, and email address, Defendant tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the advertising process.

## VI. PLAINTIFF'S EXPERIENCE

152. Plaintiff visited multiple websites where Defendant's Snap Pixel was present, including Thursdayboots.com and Zillow.com.

153. On each of these websites, Snap pixel operated in the manner described above, setting cookies on Plaintiff Charles's browser, so he can be identified on other websites, and intercepting his communications with the websites, and collecting identifying information such as his email address, phone number, and device information.

154. Defendant used the information collected by the Snap Pixel to:

(a) identity Plaintiff and either create a new profile of him or match him to a pre-existing profile;

(b) enable each website and Partner to sell Plaintiff's information to advertisers for hyper-targeted advertising based on the information collected by the Snap Pixel on the websites and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by Defendant on the websites);

(c) enable the websites and advertising partners to target Plaintiff with advertisements and serve advertisements on Plaintiff based on the information collected and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by Defendant on the websites); and

(d)    de-anonymize Plaintiff and generate revenue from the sale of his information—both what is collected on the websites and the profiles this information is linked to—to advertisers, thus boosting the websites' revenue and the value of Defendant's services.

155.   By using the cookies loaded onto Plaintiff Charles's browser, Defendant also tracked his future web browsing activity across the internet and assisted other Partner Trackers in tracking him and wiretapping his communications with websites.

156.   Plaintiff Charles was unaware that Defendant was installing trackers on his browser, aiding in the wiretapping of his communications, deanonymizing his personal data, or collecting, selling, and disclosing his personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor could he have discovered these facts.

157.   Plaintiff did not provide his prior consent to Defendant to install trackers on his browser, aid in the wiretapping of his communications, deanonymize his personal data, or collect, sell, and disclose his personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendant obtain a court order to do the same.

158.   Plaintiff has, therefore, had his privacy invaded by Defendant's violations of the ECPA, and Defendant has been unjustly enriched by enabling the disclosure and sale of the improperly collected data concerning Plaintiff Charles.

## CLASS ALLEGATIONS

159.   **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as follows:

> All residents of any state except California who visited a
> website where the Snap Pixel was present while in any
> state except California.

160.   Excluded from the Class is Defendant, any affiliate, parent, or subsidiary of any Defendant; any entity in which any Defendant has a controlling interest; any

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    35

officer director, or employee of any Defendant; any successor or assign of any Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

161. **Numerosity**. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff currently; however, it is estimated that there are tens or hundreds of millions of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Defendant's customers and advertising partners.

162. **Typicality**. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all Class Members, had his information intercepted and made available for sale by Defendant using comprehensive user profiles compiled about Plaintiff.

163. **Adequacy**. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

164. **Commonality/Predominance**. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Class include:

> (a)    Whether Defendant's acts and practices alleged herein constitute egregious breaches of social norms;

     (b)    Whether Defendant acted intentionally in violating Plaintiff's and Class Members' privacy rights under the common law;

     (c)    Whether Defendant was unjustly enriched because of their violations of Plaintiff's and Class Members' privacy rights; and

     (d)    Whether Plaintiff and Class Members are entitled to damages under CIPA or any other relevant statute;

165. **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to that would be encountered by litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION
### COUNT I
**Intrusion Upon Seclusion**

166. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

167. Plaintiff brings this claim individually and on behalf of the Class against Defendant.

168. To state a claim for intrusion upon seclusion "[Plaintiff] must possess a legally protected privacy interest … [Plaintiff's] expectations of privacy must be reasonable … [and Plaintiff] must show that the intrusion is so serious in 'nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms." *Hernandez v. Hillsides, Inc*. 47 Cal. 4th 272, 286-87 (2009).

169. Plaintiff and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive, confidential communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

170. By conducting such widespread surveillance, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights, as well as intruded upon Plaintiff's and Class Members' seclusion.

171. Plaintiff and Class Members had a reasonable expectation that their communications, identities, personal activities, and other data would remain confidential.

172. Plaintiff and Class Members did not and could not authorize Defendant to intercept data on every aspect of their lives and activities.

173. The conduct described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

  a. Defendant engages in widespread data collection and interception of Plaintiff's and Class Members' internet and app activity, including their communications with websites, thereby learning intimate details of their daily lives based on the massive amount of information collected about them.

  b. Defendant creates comprehensive profiles based on this online and offline data, which violates Plaintiff's and Class Members' common law right to privacy and the control of their personal information.

  c. Defendant sells or discloses improperly collected data about Plaintiff and Class Members, to an unknown number of advertisers for use in the Defendant's advertising network which likewise

violates Plaintiff's and Class Members' common law right to privacy and the control of their personal information.

174. Defendant's amassment of electronic information reflecting all aspects of Plaintiff's and Class Members' lives into profiles for future or present use is in and of itself a violation of their right to privacy considering the serious risk these profiles pose to their autonomy.

175. In addition, those profiles are and can be used to further invade Plaintiff's and Class Members' privacy by, for example, allowing third parties to learn intimate details of their lives and target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers and other data brokers without their consent.

176. Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under common law.

## COUNT II
### Violation of the Electronic Communications Privacy Act
### 18 U.S.C. §§ 2511(1), *et seq.*

177. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

178. Plaintiff brings this claim individually and on behalf of the Class against Defendant and on behalf of the Class against Defendant.

179. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

180. The ECPA protects both the sending and the receipt of communications.

181. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

182. The transmission of Plaintiff's website page visits, selections, purchases and persistent identifiers to each website each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

183. The transmission of this information between Plaintiff and Class members and each website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

184. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

185. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

186. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication." 18 U.S.C. § 2510(5).

187. The following instruments constitute "devices" within the meaning of the ECPA:

- The Snap Pixel;

- Any other tracking code, API, or SDK used by Defendant;

- Each partner website and advertising partner;

- The plan Defendant carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Websites.

188. Plaintiff and Class Members' interactions with each website are electronic communications under the ECPA.

189. By utilizing the Snap Pixel, as described herein, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

190. Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiff and Class members regarding their food and restaurant preferences, health concerns, real estate interests, consumption of media, geolocation, and many more. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

191. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

192. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

193. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, "[t]he association of Plaintiff's data with preexisting user profiles is a further use of Plaintiff's data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown*

*v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v.LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

194.   Defendant was not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

195.   Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy.  Plaintiff and Class Members had a reasonable expectation that Defendant would not intercept their communications and sell their data to dozens of parties without their knowledge or consent.

196.   The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. §§ 2511(1), *et seq*.

197.   As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. §§ 2510, *et seq*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of themselves and all Class Members, seek judgment against Defendant, as follows:

(a)   For an order certifying the Class pursuant to Fed. R. Civ. P. 23, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class.

(b)   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(c)   For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(d)   For pre- and post-judgment interest on all amounts awarded; and

(e) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

### **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated:  May 7, 2026        Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: */s/ Philip L. Fraietta*
     Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: klynn@bursor.com
      jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10069
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiff*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED       43